**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

ESSEX ONE, LLC,

                           Plaintiff,                    8:20-cv-00119 (BKS/DJS)

v.

TOWN OF ESSEX-TOWN OF ESSEX PLANNING
BOARD; CATHERINE DEWOLFF, as a member of the
TOWN OF ESSEX PLANNING BOARD; JIM
VANHOVEN, as a member of the TOWN OF ESSEX
PLANNING BOARD,

                           Defendants.

---

**Appearances:**

*For Plaintiff:*
Theodore M. Baum
Siddharth Bahl
McElroy, Deutsch, Mulvaney & Carpenter, LLP
820 Bausch and Lomb Place
Rochester, NY 14604

*For Defendants:*
April J. Laws
Loraine C. Jelinek
Johnson & Laws, LLC
648 Plank Road, Suite 204
Clifton Park, NY 12065

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

      Plaintiff Essex One, LLC ("Essex One") filed a Complaint and a petition under Article 78

in New York Supreme Court, Essex County against Defendants Town of Essex; Catherine

DeWolff, the current chairperson of the Town's Planning Board; and Jim Van Hoven, the former

chairperson of the Planning Board, alleging the following claims under 42 U.S.C. § 1983 and New York law: (1) violations of the Due Process and Equal Protection Clauses of the Fourteenth Amendment, (2) tortious conduct, (3) intentional interference with a contract, and (4) tortious interference with a contract. (Dkt. No. 2). Plaintiff also brings a petition under Article 78 of the New York State Civil Practice Laws and Rules. (*Id.* ¶¶ 122–41).

On February 3, 2020, Defendants removed the action under 28 U.S.C. § 1446 to this Court based on federal question jurisdiction under 28 U.S.C. § 1331. (Dkt. No. 1). Defendants now move to dismiss the Complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Dkt. No. 8). The parties have filed responsive briefing, (Dkt. Nos. 15, 18), and the Court heard oral argument on the motion on August 20, 2020. For the following reasons, the motion is granted in part, the federal claims are dismissed, and the state law claims are remanded.

## II.    BACKGROUND

### A.    Facts[1]

In 2011, Plaintiff Essex One purchased 2264-2266 Lake Shore Road (the "Property") in the Town of Essex, New York (the "Town"). (Dkt. No. 2, ¶¶ 1, 5). To "enhance [its] ability to sell the Property," on the Town's recommendation, Plaintiff "divided the Property into two separate parcels" (respectively, "First Parcel" and "Second Parcel"). (*Id.*). The Town knew that Plaintiff's purpose of "dividing the Property into two parcels" was to make "the Property more attractive to potential purchasers and to enjoy the significant view of Lake Champlain." (*Id.* ¶ 14).

---

[1] The facts are drawn from the Complaint, its exhibits, and some of the documents attached to Defendants' motion to dismiss. Fed R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes."). *See infra* Section IV.A. The Court assumes the truth of, and draws reasonable inferences from, the well-pleaded factual allegations. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

The First Parcel "includes a single-family residence" known as the Cleland House, which "features a scenic view of Lake Champlain and the surrounding countryside." (*Id.* ¶ 7). The Cleland House had been "dormant and unoccupied" for over 20 years before Plaintiff purchased the Property. (*Id.*). The Second Parcel "features a marina and a shipyard." (*Id.* ¶ 8). The Second Parcel was "improved by a restaurant known as the Rudder Club," which was "constructed in or around 1950" and in "very poor condition prior to Plaintiff's acquisition of the Property." (*Id.* ¶¶ 8, 11). Plaintiff "holds an easement allowing access from the First Parcel to the Second Parcel." (*Id.* ¶ 9).

After Plaintiff purchased the Property, it operated the marina and related accommodations at the Property's shipyard. (*Id.* ¶ 10). Plaintiff leases "boat slips" from May to October, which is the shipyard's sole revenue source. (*Id.*). From 2011–16, Plaintiff "invested significant funds in the acquisition, renovation and maintenance of the Cleland House and the surrounding land." (*Id.* ¶ 12). For example, Plaintiff spent $279,666 "repairing and remodeling the docks of the shipyard as well as the Rudder Club." (*Id.* ¶ 13). After years of effort, however, "it became obvious" that modernizing an "outdated restaurant" on the Property "was not a prudent economic endeavor." (*Id.*).

Plaintiff contracted with Engel & Volkers Lake Placid Real Estate to sell the Property, (*id.* ¶¶ 90, 55), and on May 12, 2016, Plaintiff "listed the Property for sale." (*Id.* ¶ 15). Defendants knew of this contract and of Plaintiff's plan to sell the Property. (*Id.* ¶ 92). The Property "did not sell" in Summer 2016. (*Id.*). The Board has intentionally" hindered Plaintiff's efforts to do so. (*Id.* ¶¶ 76–78).

On September 8, 2016, "to increase the value of the Cleland House and make it more attractive to potential purchasers," "Plaintiff submitted an Application for Special Use Permit

with Site Plan"[2] to demolish the Rudder Club (the "Demolition Application") to the Town of Essex Planning Board (the "Board"). (*Id.* ¶ 16; Dkt. No. 2-1, at 1–10). In the Demolition Application, "Plaintiff made clear that it planned to install a green space, picnic area," and update the restroom facilities at the shipyard. (Dkt. No. 2, ¶ 16; Dkt. No. 2-1, at 2–3). Plaintiff alleges that removing the Rudder Club would improve "the ambiance of the Property, the scenic views of Lake Champlain and the surrounding coastline enjoyed from the Cleland House," and increase the Property's "marketability and value" to the benefit of the Town and its residents. (Dkt. No. 2, ¶ 17). "Plaintiff also planned to commence other related construction projects on the Property prior to marketing the Property for sale"; these projects, however, "were largely contingent on the successful demolition of the Rudder Club." (*Id.* ¶ 18).

The Demolition Application was put on the Board's agenda for its September 15, 2016 meeting. (*Id.* ¶ 19). According to the minutes from that day's meeting, Defendant Jim Van Hoven, "visited the Property for inspection before the meeting." (*Id.* ¶ 20; Dkt. No 2-1, at 12). At the meeting, two Board members noted that the Rudder Club "contribut[ed] to the historic value and cultural value" of the Town and the former owner of the Rudder Club spoke in opposition to its demolition. (Dkt. No 2, ¶ 20; Dkt. No. 2-1, at 12–13). Further, according to the minutes, Larry Smead, one of Plaintiff's representatives, "made clear that the Property could not be sold with the Rudder Club in existence." (Dkt. No. 2, ¶ 21; Dkt. No. 2-1, at 13).

Although, "the scope of the Application was only to demolish the Rudder Club and create green space, the Planning Board issued a positive declaration that Plaintiff would be required to prepare an Environmental Impact Statement ("EIS") before the Application could be presented

---

[2] Plaintiff has submitted the Town's Zoning Law as an exhibit to its Complaint. (Dkt. No. 2-1, at 14–115). Section 3.1-9-3 of the Zoning Law requires that "expansion or change to an existing structure or use, including demolition" in the Historical District requires a "Special Use Permit with Site Plan approval." (Dkt. No. 2-1, at 35).

for a public hearing." (Dkt. No. 2, ¶ 22; Dkt. No. 2-1, at 13). The Board "classified the potential demolition" as a "Type 1 action in the historic district." (Dkt. No. 2, ¶ 22; Dkt. No. 2-1, at 13). Plaintiff alleges that this classification was improper because a Type 1 declaration requires the Board to identify how demolition "may have" a "significant adverse impact on the environment," and the Board did not do so.[3] (Dkt. No. 2, ¶ 23). The Board "made clear that failure to submit an EIS would result in the denial of the Application." (*Id.* ¶ 24; Dkt. No. 2-1, at 13 ("[Van Hoven] advised Mr. Smead that should he choose not to complete the EIS, the application dies.").

To comply with the Board's mandates, Plaintiff "retained an outside agency" to prepare an EIS, which cost over $4,000. (Dkt. No. 2, ¶¶ 26, 35). On December 9, 2016, Plaintiff met with Board representatives, including Van Hoven and a Town environmental consultant, Dr. Ann Holland. (*Id.* ¶¶ 27–28). Beginning in December 2016, the Board began to (1) "turn the microphones off during discussions involving [Plaintiff] and its affiliates during certain portions of the meetings," (2) "change meeting minutes," and (3) "misconstrue statements made by [Plaintiff]" during Board meetings. (*Id.* ¶ 136). During the December 9th meeting, Dr. Holland stated that a Type 1 declaration had been issued because the Rudder Club is on the National Register of Historic Places, but the Town "failed to produce any evidence of this." (*Id.* ¶ 28).  A February 8, 2017 letter sent from the New York State Parks, Recreation, and Historic Preservation Department notified Dr. Holland that the Rudder Club was "not architecturally significant" and that it had "no concerns with the removal of this building as proposed." (Dkt. No. 2, ¶ 36; Dkt. No. 2-1, at 116). Van Hoven asked Plaintiff to complete a Local Waterfront Revitalization Program Consistency Assessment Form (the "Assessment Form"), which Plaintiff

---

[3] Plaintiff may be referring to Section 6.3-4 of the Zoning Law, which states: "Where the proposed action may have a significant effect on the environment, the Planning Board shall issue a positive declaration and require the submission of a Draft Environmental Impact Statement." (Dkt. No. 2-1, at 68).

submitted on or around March 2017.[4] (*Id.* ¶ 38; Dkt. No. 2-1, at 118–22; *see generally* Dkt. No. 2-2, at 2–105).

On April 7, 2017 Defendant Catherine DeWolff emailed Plaintiff's former attorney requesting certain plans and advised that if she did not receive the requested materials by April 10, the Board would not entertain the Assessment Form and the Demolition Application would be postponed until the Board received the requested information.[5] (Dkt. No. 2, ¶ 41; Dkt. No. 2-2, at 1). Plaintiff replied by email the same day and explained that demolition was the only work to be done and "reiterated that it would not be digging into the ground, disturbing the underground soil, or disturbing artifacts" and that "green space would be created." (Dkt. No. 2, ¶ 43).

The Demolition Application was subsequently placed on the agenda for the Board's April 20, 2017 meeting. (*Id.* ¶ 44). At that meeting, the Board "voted to deem the demolition a small environmental impact and issued a negative environmental impact declaration." (*Id.* ¶ 45). Board members "voiced frustration" that the "demolition was potentially going to go forward" and one Board member "publicly voiced frustration that the Rudder Club could potentially be lost." (*Id.* ¶¶ 45–46). The Board also held a public hearing on May 18, 2017. (*Id.* ¶ 48; *see also* Dkt. No. 2-2, at 106–11). A motion was before the Board to accept the draft application permit, "with an added condition of having the Rudder Club located by a licensed land surveyor so that a future owner could use the footprint space." (Dkt. No. 2, ¶ 48; Dkt. No. 2-2, at 107). This was "the first time" Plaintiff was informed of a "condition being placed with the issuance of [the Demolition]

---

[4] The Complaint states that Plaintiff submitted the form in March 2016 but based on the events described, it appears the form was submitted in March 2017. (Dkt. No. 2, ¶¶ 38–40; *see also* Dkt. No. 2-1, at 122).

[5] Plaintiff alleges upon information and belief that this request was "not consistent" with the Town's Waterfront Consistency Review Law (the "Consistency Review Law"). (Dkt. No. 2, ¶ 42). Plaintiff has attached the Consistency Review Law with the Complaint but does not specify which provision DeWolff's request violated. (*See generally* Dkt. No. 2-2, at 2–105).

Application," and no explanation for the condition was provided.[6] (Dkt. No. 2, ¶ 48). According to the meeting's minutes, that motion failed on a roll call vote. (Dkt. No. 2-2, at 107).

On May 31, 2017, at a "special meeting" "to vote on the demolition permit," the Board approved Plaintiff's Demolition Application with the surveying condition. (Dkt. No. 2, ¶ 51; Dkt. No. 2-2, at 112). Although the Board "had no lawful authority to require a survey of the Rudder Club," Plaintiff "decided to obtain a survey rather than delay the demolition any further." (*Id.* ¶ 52). As a result of "the significant delays" in the review and approval process, Plaintiff was unable "to demolish the Rudder Club in time to market the property" during summer 2017. (*Id.* ¶ 53). Summer is "the most marketable time to sell property along Lake Champlain." (*Id.* ¶ 54).

In addition, the Board continues to "arbitrarily and maliciously stifle and delay other applications brought by Plaintiff or its affiliates." On April 16, 2018, Plaintiff filed an application with the Board for a "special use permit" to construct a set of stairs leading from the First Parcel to the Second Parcel (the "Staircase Application"). (*Id.* ¶ 58; Dkt. No. 2-2, at 113–18). As part of the application, Plaintiff submitted a Partial Site Plan "prepared by Plaintiff's architect," which provided that "all disturbed areas" in the staircase construction "shall be immediately planted and mulched." (Dkt. No. 2, ¶ 61). On June 21, 2018, Plaintiff presented the Staircase Application to the Board. (*Id.* ¶ 63). After learning that "the staircase would be located" on both parcels, the Board "strongly encouraged" Plaintiff to obtain an easement for "reciprocal use between [the] parcels." (*Id.* ¶ 64). The Board's comments "indicated to Plaintiff" that the Staircase Application "would be denied" without the easement. (*Id.* ¶ 65). Although the Board

---

[6] One Board member stated that the "Town was interested in putting the Rudder Club on the Historic Register in the future." (*Id.* ¶ 50). This comment was made "to stall the demolition." (*Id.*).

"had no lawful authority" to require the easement, Plaintiff "was forced to prepare and file an easement" between the parcels.[7] (*Id.* ¶ 67; Dkt. No. 2-2, at 125–28).

On or about July 19, 2018, the Board met regarding the Staircase Application. (Dkt. No. 2, ¶ 68; *see also* Dkt. No. 2-2, at 129–32). At the meeting, Plaintiff's representative, Justin Green, informed the Board, in response to questioning, that the purpose of the staircase was "to provide easier access between" the parcels. (Dkt. No. 2, ¶¶ 68–69; Dkt. No. 2-2, at 129–32). The Board "commented on how it 'did not like how the easement was written,' and inquired why Plaintiff did not 'obtain a right of way instead.'" (Dkt. No. 2, ¶ 70). The Board denied the Staircase Application "without explanation," (*id.* ¶ 72; Dkt. No. 2-2, at 131), and did not "set forth its finding in writing as part of its decision-making process," as required by New York State and Town law. (*Id.* ¶ 74). Plaintiff asserts "[u]pon information and belief" that the Staircase Application was denied mainly because of the Board's "animosity toward member of [sic] Plaintiff." (*Id.* ¶ 75).

At some point, Board chairperson DeWolff, Van Hoven's successor, told Green that "the Staircase Application "was denied, in part, because Plaintiff did not submit an erosion plan with the Staircase Application." (*Id.* ¶ 73 & n.4). This "shocked" Green because (1) Plaintiff had submitted an erosion plan, (*id.* ¶¶ 61, 73, 130; Dkt. No. 2-2, at 119–24), (2) the Board had never requested one, and (3) "the site of the staircase construction is relatively flat." (Dkt. No. 2, ¶¶ 73, 131). On July 30, 2019—about one year later—the Staircase Application was approved. (Dkt. No. 8-3, at 2).

---

[7] As noted above, Plaintiff alleges that it "holds an easement allowing access" between the parcels, (Dkt. No. 2, ¶ 9), but it is not clear when Plaintiff obtained this easement.

Since Plaintiff submitted the Demolition Application to the Board, members of the Board, including Van Hoven, "have and continue to" publicly "voice their animosity" toward Plaintiff and its members when "Plaintiff and/or its affiliates" have matters before the Board. (*Id.* ¶ 57). The Board has "maliciously, intentionally, and arbitrarily failed to timely grant" Plaintiff's permit applications without showing "good cause." (*Id.* ¶ 76). In total, Plaintiff invested more than $1,516,261.00 in the Property since its acquisition. (*Id.* ¶ 12). Additionally, Plaintiff alleges it has "endure[d] significant damages," including "lost revenue from the leasing of boat slips during the boating season"; carrying costs of over $1,000,000 because it could not "market the property for sale"; and "significant costs expended to retain environmental consultants and architects" to comply with the Board's "unfounded requests" for the EIS and "more detailed erosion plans." (*Id.* ¶¶ 77, 79).

In addition to damages, Plaintiff also seeks the following: (1) an order "granting the issuance of [Plaintiff's] staircase permit"; (2) an order "compelling [Defendants] to comply with the Public Officers Law; and (3) an order "compelling [Defendants] from engaging in arbitrary and malicious conduct during its review of applications submitted by [Plaintiff]." (*Id.* at 26).

## B.    The Town's Zoning Law

To its Complaint, Plaintiff has attached the Town's Zoning Law (the "Zoning Law"). (Dkt. No. 2-1, at 14–115). The Zoning Law states that its purpose is "to protect and promote public health, safety, comfort, convenience, economy, natural, agricultural, and cultural resources, aesthetics, and the general welfare" and then describes additional purposes, including, inter alia, preserving the Town's "natural resources and rural character," "minimiz[ing] negative environmental impacts of development, especially . . . the shorelines and watersheds of Lake Champlain." (Dkt. No. 2-1, at 20).

Three additional parts of the Zoning Law are relevant here: section 3.1-9, section 4.5, and article 6. Section 3.1-9 generally governs the Town's Historic District (where the Property is located), (*id.* at 3), section 4.5 governs "demolition, relocation, or removal of structures" in the Town's Historic and Shoreline Overlay Districts, (*id.* at 43), and article 6 governs special use permits. (*Id.* at 66–70).

Section 3.1-9-2 "declare[s] as a matter of public policy that the protection, enhancement, and perpetuation of landmarks, structures, and historic districts are necessary to promote the economic, cultural, educational, and general welfare of the public" and that the section "is intended to," inter alia, "protect and enhance the landmarks and historic districts which represent distinctive elements of the Town of Essex historic, architectural and cultural heritage." (*Id.* at 35).

Section 3.1-9-4 states that a

> property owner . . . who wishes to build, renovate, move, demolish, or take any action involving exterior changes to a property, which requires the issuance of a building permit for such exterior changes is required to apply to the Zoning Officer for the required permit. If the property is located in the Essex Historic District, or is listed on the State or National Register of Historic Places, the Zoning Officer will refer the application to the Planning Board for review before a building permit is issued or before any construction can begin. No Building Permit shall be issued for such proposed work until a Special Use Permit with Site Plan has first been approved by the Planning Board.

(*Id.* at 35). Section 3.1-9-5 states that the Board "will review the proposed changes and determine whether [they] can be accommodated without compromising those attributes which make the building architecturally significant as a historic resource" and whether "the materials, placement and design involved are appropriate to the historic character of the district and/or nearby historic properties. . . ." (*Id.*).

Section 3.1-9-7 states that, "[i]n addition to the application requirements for a Special Use Permit with Site Plan," the Board may require "additional information," including, inter alia, "any other information which the Planning Board may deem necessary in order to visualize the proposed work." (*Id.* at 36). That same section also lists what the Board "shall seek to accomplish" in "reviewing all such applications." (*Id.*). This list includes, inter alia, "strengthen[ing] the environmental setting of the historic district"; "assur[ing] architectural compatibility with the structure or property in question and with neighboring historic properties, such as aesthetic, historical, and architectural values, architectural style, design, arrangement, texture, material and color"; and "prevent[ing] the demolition or destruction of significant structures, terrain, landscape, or scenic views whose preservation is an objective of the district." (*Id.* at 36).

Section 4.5 governs demolitions. (*Id.* at 43–44). That section states that, in determining whether to grant Special Use Permit to demolish a structure, the Board "shall consult with any persons it deems to have knowledge as to the historical or architectural significance of the structure proposed to be demolished." (*Id.* at 43). In addition, Section 4.5 states that the Board's "decision shall be based on the principles set forth in Section 3.1-9.8" of the Zoning Law. (*Id.*). Those principles state, inter alia:

> C. Distinctive stylistic features or examples of skilled craftsmanship that characterize a building, structure, or site shall be treated with sensitivity;
>
> D. The general design, character, and appropriateness to the property of the proposed alteration shall be considered in determining whether such new construction and materials will enhance, or at a minimum, not detract from the property's historic character and setting . . . ;
>
> F. Deteriorated architectural features shall be repaired rather than replaced wherever economically feasible. In the event replacement

> is necessary, the new material should match the material being
> replaced in composition, design, color, texture, and other visual
> guidelines[.]

(*Id.* at 36–37). Furthermore, Section 4.5 explains that "[u]pon determination that the proposed

demolition is not detrimental to the architectural or historic character of the Historic District" the

Board "shall approve the application for the proposed demolition, with reasonable conditions as

to the removal of demolition debris, restoration of the site, and the period of time allowed

therefore." (*Id.* at 43). "Upon determination that the proposed demolition is detrimental to the

architectural or historic character of the Historic District" the Board "shall not permit the

proposed demolition." (*Id.* at 43–44).

Article 6, section 6.1-2 of the Zoning Law governs the issuance of special use permits

and states that:

> [I]t is the policy of the Town of Essex to balance the allowance and
> encouragement of a variety of uses of land and to foster economic
> opportunities within the municipal boundaries of the Town,
> provided that such uses do not unreasonably and adversely affect
> neighboring properties, the natural environment, the rural and
> historic character of the Town or the long-term development of the
> Town. Many uses are, therefore, permitted only upon issuance of a
> Special Use Permit by the Planning Board in order to ensure that
> these uses are appropriate to their surroundings and satisfy
> performance criteria on a case-by-case basis.

(*Id.* at 66–67). Section 6.2 provides a list of requirements applicants must submit with their

special use permits "together with whatever other information the Planning Board deems

appropriate." (*Id.* at 67). The list concludes by providing that "[t]he Planning Board may waive

or add any requirements for an application submission if it deems appropriate in order to

accomplish the purposes set forth herein." (*Id.*). Section 6.3-8-1 states that the Board "shall

grant, deny, or grant subject to conditions the application for a Special Use Permit within 62 days

after the hearing. Any decision by the Planning Board shall contain written findings explaining

the rationale for the decision. . . ." Section 6.3-8-2 states that "[i]n granting a Special Use Permit, the Planning Board may impose conditions that it considers necessary to protect historic or cultural resources, and the health, safety, welfare of the Town and to achieve the purposes contained in Section 1.6" of the Zoning Law. (*Id.* at 70).

## III.   LEGAL STANDARD

To survive a motion to dismiss, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Although a complaint need not contain detailed factual allegations, it may not rest on mere labels, conclusions, or a formulaic recitation of the elements of the cause of action, and the factual allegations 'must be enough to raise a right to relief above the speculative level.'" *Lawtone-Bowles v. City of New York*, No. 16-cv-4240, 2017 WL 4250513, at *2, 2017 U.S. Dist. LEXIS 155140, at *5 (S.D.N.Y. Sept. 22, 2017) (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

## IV.   DISCUSSION

### A.     Documents to Consider in Deciding Motion to Dismiss

Plaintiff has attached exhibits to its Complaint. (Dkt. Nos. 2-1, 2-2). The parties also attached documents with their memoranda of law. Specifically, Defendants have attached: (1) the minutes of a July 18, 2019 Board meeting and (2) the permit approving Plaintiff's Staircase Application. (Dkt. Nos. 8-2, 8-3). To its response to Defendants' motion to dismiss, Plaintiff has

attached: (1) an affidavit from counsel; (2) Plaintiff's notice of claim to the Town; (3) a July 22, 2018 email from DeWolff to Green, Plaintiff's representative; and (4) a letter dated August 3, 2018 enclosing Plaintiff's Partial Site Plan for the "proposed exterior stair." (Dkt. Nos. 15-2, 15-3, 15-4).[8] Thus, as a preliminary matter the Court must decide which of these documents, if any, to consider in resolving this motion.

"Generally, consideration of a motion to dismiss under Rule 12(b)(6) is limited to consideration of the complaint itself." *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006). However, considering "materials outside the complaint is not entirely foreclosed on a 12(b)(6) motion." *Id.* A complaint "is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 230 (2d Cir. 2016) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002)). The Court will therefore consider the documents "attached to the complaint as exhibits." (Dkt. Nos. 2-1, 2-2). *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).[9]

"Where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." *Id.* (quoting *DiFolco*, 622 F.3d at 111 (internal quotation marks omitted)). "[I]f material is not integral to or otherwise incorporated in the complaint, it may not be considered unless the motion to dismiss is converted to a motion for summary judgment and

---

[8] Plaintiff also attached the summons from the state action, but that document is already in the record.  (Dkt. Nos. 15-5; Dkt. No. 2).

[9] This includes the Partial Site Plan, which Plaintiff appears to have attached again with its response to Defendants' motion. (Dkt. No. 15-4). The Court declines to consider the cover letter attached to the version of the Partial Site Plan filed with Plaintiff's opposition, which does not meet any of the criteria for considering documents outside the complaint on a motion to dismiss. (Dkt. No. 15-4, at 2).

all parties are 'given a reasonable opportunity to present all the material that is pertinent to the motion.'" *Id.* (quoting Fed. R. Civ. P. 12(d)).

The Court will consider the permit approving Plaintiff's Staircase Application because the document is integral to the Complaint. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004); *Kabrovski v. City of Rochester*, 149 F. Supp. 3d 413, 418 (W.D.N.Y. 2015) (considering a city planning commission's decision where the decision was "integral to the Complaint"). Here, the granted permit is integral because it goes to the heart of one aspect of Plaintiff's requested relief, which seeks "an Order granting the issuance of [the] staircase permit." (Dkt. No 2, at 26). *See Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) (explaining that in "most instances" where courts consider extrinsic documents in deciding a motion to dismiss without converting the motion to one for summary judgment, "the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls"). Plaintiff does not dispute the authenticity of this permit, which it confirmed at oral argument. (*See* Dkt. No. 15, at 7 n.2, 11, 23)

The Court declines to consider the remaining documents at issue. These documents were "'not attached to the complaint, w[ere] not incorporated by reference in the complaint,' and therefore 'w[ere] not integral to the complaint,' it is improper to consider [them] when considering a motion to dismiss." *Jones v. Halstead Mgmt. Co., LLC*, 81 F. Supp. 3d 324, 332 (S.D.N.Y. 2015) (quoting *DiFolco*, 622 F.3d at 113).[10]

---

[10] The Court also declines to consider Plaintiff's notice of claim as it is relevant only to Plaintiff's state law claims, which are remanded. *See infra* Section IV.D. (Dkt. No. 15-2).

### B.       Mootness

Defendants argue that all of Plaintiff's claims are moot for two "distinct reasons." (Dkt. No. 8-4, at 14). First, the Town has already issued Plaintiff the special use permit for the staircase, and second, Plaintiff "has no further pending applications before the Town" or the Board. (*Id.*; Dkt. No. 18, at 6–7). Plaintiff argues, inter alia, that the Town's decision does not moot its claim for damages. (Dkt. No. 15, at 14).

"The principle that a federal court 'lacks jurisdiction to consider the merits of a moot case is a branch of the constitutional command that the judicial power extends only to cases or controversies.'" *Chevron Corp. v. Donziger*, 833 F.3d 74, 123 (2d Cir. 2016) (quoting *Powell v. McCormack*, 395 U.S. 486, 496 n.7 (1969)). "A case is moot when 'the parties lack a legally cognizable interest in the outcome,'" *Id.* at 123–24 (quoting *City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000)). A case is moot "only when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Id.* at 124 (emphasis omitted) (quoting *Chafin v. Chafin*, 568 U.S. 165, 172 (2013)). "[A]s long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot." *Id.* (alteration in original) (quoting *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307–08 (2012)).

Here, this case is not moot because Plaintiff seeks monetary damages for alleged constitutional violations. *See McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020); *Farquharson v. Lafayette*, No. 19-cv-3446, 2020 WL 1699985, at *6, 2020 U.S. Dist. LEXIS 61810, at *16 (S.D.N.Y. Apr. 7, 2020) ("[T]he Court concludes that Plaintiff's claims are not mooted to the extent that she seeks damages related to Defendants' purported constitutional violations."). Thus, Defendants' motion to dismiss Plaintiff's Complaint on this basis is denied.

### C.      Section 1983 Claims

The Complaint styles its fourth cause of action as "42 U.S.C. § 1983," citing to the Due

Process and Equal Protection Clauses of the Fourteenth Amendment, and alleging violations of

substantive due process and equal protection. (*See* Dkt. No. 2, ¶¶ 101–21). In its response,

Plaintiff asserts that its § 1983 claim includes violations of procedural due process.[11] (Dkt. No.

15, at 12).

### 1.      Substantive and Procedural Due Process

Defendants argue that the Complaint fails to allege that Defendants engaged in

"conscious shocking" behavior, in violation of substantive due process claim, particularly since

both of Plaintiff's applications were ultimately granted. (Dkt. No. 8-4, at 17). With respect to the

procedural due process claim, Defendants contend that Plaintiff was afforded sufficient process

that resulted in both of Plaintiff's applications being granted.[12] (Dkt. No. 18, at 7).

The Due Process Clause of the Fourteenth Amendment protects persons against

deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. "To prevail on either a

procedural or a substantive due process claim," the plaintiff "must establish that he possessed a

liberty or property interest of which the defendants deprived him." *Sutera v. Transp. Sec. Admin.*,

708 F. Supp. 2d 304, 313 (E.D.N.Y. 2010); *Kabrovski*, 149 F. Supp. 3d at 421. In land use

regulation cases, the Second Circuit applies "a strict 'entitlement test' to determine if the

abridgement of an asserted property right is cognizable." *Harlen Assocs. v. Inc. Vill. of Mineola*,

---

[11] In their opening memorandum of law, Defendants did not move to dismiss a procedural due process claim,
explaining in their reply brief that "review of the Complaint does not suggest that such a claim was made." (Dkt. No.
18, at 7). Defendants briefed the issue in their reply brief. (Dkt. No. 18, at 7–8). Accordingly, the Court addresses the
merits of a procedural due process claim here.

[12] Defendants alternatively argue that Plaintiff's procedural due process claim is unripe because he could have pursued
an Article 78 proceeding and that the Article 78 petition here is untimely. (Dkt. No. 18, at 7–8). As the Court dismisses
Plaintiff's due process claims for failure to allege deprivation of a constitutionally protected property interest, the
Court does not reach this argument.

273 F.3d 494, 503–04 (2d Cir. 2001) (quoting *DLC Mgmt. Corp. v. Town of Hyde Park,* 163 F.3d 124, 130 (2d Cir. 1998)). "A 'legitimate claim of entitlement' exists where, under applicable state law, 'absent the alleged denial of due process, there is either a certainty or a very strong likelihood that the application would have been granted.'" *Id.* (quoting *Walz v. Town of Smithtown,* 46 F.3d 162, 168 (2d Cir. 1995)). "A clear entitlement, and, in turn, a constitutionally protected property interest, exists only when 'the discretion of the issuing agency is so narrowly circumscribed that approval of a proper application is virtually assured.'" *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995) (quoting *RRI Realty Corp. v. Inc. Vill. of Southampton*, 870 F.2d 911, 918 (2d Cir. 1989)). However, where a permit "has already been granted, the clear entitlement test" no longer applies "because the test applies only to permits being sought. The special permit, once issued, unquestionably [is] the property of [the recipient]." *Soundview Assocs. v. Town of Riverhead*, 725 F. Supp. 2d 320, 334 (E.D.N.Y. 2010) (alterations in original) (internal quotation marks omitted) (quoting *Villager Pond*, 56 F.3d at 379).

Here, Plaintiff applied for the Demolition Application on September 8, 2016. (Dkt. No. 2, ¶ 16; Dkt. No. 2-1, at 1–10; Dkt. No. 2-2, at 112). Prior to the Demolition Application being granted, Plaintiff was required to submit an EIS, submit the Assessment Form, and obtain the survey of the Rudder Club. (Dkt. No. 2, ¶¶ 26, 35, 38). Plaintiff alleges that the Board began to turn off microphones during discussions regarding Plaintiff, "change meeting minutes," and misconstrue Plaintiff's statements during meetings. (*Id.* ¶ 136). Ultimately, however, the Demolition Application was granted with the survey condition on May 31, 2017. (Dkt. No. 2, ¶ 51; Dkt. No. 2-1, at 1–10; Dkt. No. 2-2, at 112).

Plaintiff submitted the Staircase Application on June 21, 2018. (Dkt. No. 2-2, at 113–18; Dkt. No. 2, ¶ 60). Prior to the Staircase Application being granted, which was initially denied within the Board's 62-day window on July 19, 2018, Plaintiff was required to obtain an easement for "reciprocal use between [the] parcels," submit "more detailed erosion plans," and endure delay of about a year until the Staircase Application was approved on July 30, 2019. (*Id.* ¶¶ 64, 72, 79; Dkt. No. 2-1, at 69–70; Dkt. No. 2-2, at 113–18; Dkt. No. 8-3, at 2). As both applications were eventually granted, the Complaint fails to allege Defendants *deprived* Plaintiff of any protected property interest. *See Witt v. Vill. of Mamaroneck*, 639 F. App'x 44, 45 (2d Cir. 2016) ("We affirm the dismissal of the [the plaintiffs'] substantive due process claim on the ground that [the plaintiffs] in fact obtained a variance, which authorized the continuance of construction, and thus were not deprived of any protected property interest in their building permit.").

Plaintiff also appears to allege that Defendants violated its due process rights by virtue of delaying and conditioning the grants of the permits. (Dkt. No. 2, ¶¶ 114–15, 118, 120). The question becomes, then, whether Plaintiff has alleged a property interest in the obtaining either of the permits without the delays or conditions. *See Witt v. Vill. of Mamaroneck*, No. 12-cv-8778, 2015 WL 1427206, at *11, 2015 U.S. Dist. LEXIS 39669, at *37–39 (S.D.N.Y. Mar. 27, 2015) ("Since the Court has found that Plaintiffs have not alleged a deprivation of any property interest they may have had in the building permit, the question is whether they have a property interest in a variance without the challenged conditions attached."), *aff'd*, 639 F. App'x 44 (2d Cir. 2016). The Court therefore applies the clear entitlement test, which "turns on the degree to which state and local law unambiguously limits the Board's discretion" to delay and condition the grant of Plaintiff's permits. *See Clubside*, 468 F.3d at 154; *Danbury Sports Dome, LLC v. City of Danbury*, No. 15-cv-931, 2017 WL 4366961, at *2, 2017 U.S. Dist. LEXIS 162355, at *6–7 (D.

Conn. Sept. 30, 2017) (finding that the plaintiff's "due process claims" were "legally insufficient" where it "received all permits needed to build and begin operating" and "at issue" was "the allegedly unreasonable delay plaintiff experienced in getting permits and the allegedly unnecessary conditions that were attached to them"). At oral argument, with respect to the Staircase Application's initial denial, Plaintiff asserted that because the application was ultimately granted, that demonstrates that there was a very strong likelihood or certainty that the application would have been granted absent the Board's additional requests and delays. That argument misses the mark. The inquiry here "focuses on the extent to which the deciding authority may exercise *discretion* in arriving at a decision, rather than on an estimate of the probability that the authority will make a specific decision." *Zahra*, 48 F.3d at 680.

As discussed above, *see supra* Section II.B., the Zoning Law contains numerous considerations that the Board may weigh when deciding whether to grant or deny a permit. (*E.g.*, Dkt. No. 2-1, at 36 (stating "general principles that the Board "shall be guided by . . . in approving or disapproving applications")). These considerations seek to maintain the architectural, aesthetic, and historic character of the Town's historic district, including the Lake Champlain shorelines, and to "strengthen the environmental setting of the historic district." (*E.g.*, *id.* at 20, 35–36, 43–44; *see also id.* at 66–67, 70). The Zoning Law allows the Board to require "additional information," including, inter alia, "any other information" the Board "may deem necessary in order to visualize the proposed work." (*Id.* at 36). In describing what the Board may require from applicant's for special use permits, the Zoning Law states that applicants shall submit, inter alia, "whatever other information the Planning Board deems appropriate" and permits the Board to "waive or add any requirements for an application submission if it deems appropriate in order to accomplish the purposes set forth" in the Zoning Law. (*Id.* at 67; *see also*

*id.* at 70 ("In granting a Special Use Permit, the Planning Board may impose conditions that it considers necessary to protect historic or cultural resources, and the health, safety, welfare of the Town and to achieve the purposes contained in Section 1.6" of the Zoning Law)).

None of the Zoning Law's relevant language "so narrowly circumscribed" the Board's discretion such that "approval of a proper application" without the delay, additional materials, or additional conditions here was "virtually assured." *See Villager Pond*, 56 F.3d at 378 (quoting *RRI Realty Corp.*, 870 F.2d at 918); *Sacher v. Vill. of Old Brookville*, 967 F. Supp. 2d 663, 672 (E.D.N.Y. 2013) ("Where the right asserted is the right to a building permit or zoning variance, the existence of discretionary action with respect to such applications renders the alleged interest nonprotected."). "Plaintiff has not pointed to any provision in the relevant statutes or regulations that confers a legitimate claim of entitlement to permits issued in a more timely manner or without any conditions attached." *Danbury Sports Dome*, 2017 WL 4366961, at *2, 2017 U.S. Dist. LEXIS 162355, at *7 (D. Conn. Sept. 30, 2017). Accordingly, its due process claims fail, and Defendants' motion to dismiss those claims is therefore granted.

### 2.    Equal Protection

Defendants argue that Plaintiff has not plausibly pled its equal protection claim because Plaintiff fails to allege that it was treated "differently than any similarly situated property owner or corporate entity within the Town." (Dkt. No. 8-4, at 18). Further, Defendants contend that even if Plaintiff could establish that requirement, Plaintiff has "failed to allege a protected status" or any facts suggesting that "Defendants' actions were motivated by an intent to discriminate against Plaintiff," "to punish or inhibit the exercise of [its] constitutional rights, or by a malicious or bad faith intent to injure Plaintiff." (Dkt. No. 8-4, at 18–19; Dkt. No. 18, at 9). Plaintiff responds that it has pled two alternative violations of equal protection: that it was "adversely

treated" compared to others "similarly situated" based on "impermissible considerations" and
that it has plausibly alleged a "class of one" equal protection claim. (Dkt. No. 15, at 14–15).

To establish a "violation of equal protection by selective enforcement," the plaintiff must
show that "compared with others similarly situated, [it] was selectively treated; and . . . such
selective treatment was based on impermissible considerations such as race, religion, intent to
inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a
person." *Crowley v. Courville*, 76 F.3d 47, 52–53 (2d Cir. 1996) (quoting *LaTrieste Rest. &
Cabaret Inc. v. Village of Port Chester*, 40 F.3d 587, 590 (2d Cir. 1994)). For a "class of one"
equal protection claim, "the plaintiff must plausibly allege that he or she has been intentionally
treated differently from others similarly situated and no rational basis exists for that different
treatment." *Progressive Credit Union v. City of New York*, 889 F.3d 40, 49 (2d Cir. 2018) (citing
*Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)); *Ruston v. Town Bd. for Town of
Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010) ("[C]lass-of-one plaintiffs must show an extremely
high degree of similarity between themselves and the persons to whom they compare
themselves." (quoting *Clubside*, 468 F.3d at 159)).

Here, as Defendants argue, Plaintiff has not identified a similarly situated comparator that
received different treatment than Plaintiff. *E.g.*, *MacPherson v. Town of Southampton*, 738 F.
Supp. 2d 353, 371 (E.D.N.Y. 2010) (dismissing equal protection claim, "whether pled as a
selective enforcement claim or a class-of-one claim," because the complaint did "not identify any
comparators or similarly situated entities at all"); *Cassidy v. Scoppetta,* 365 F. Supp. 2d 283,
290–91 (E.D.N.Y. 2005) (finding the plaintiffs "failed to allege the most fundamental aspect of
an equal protection claim" where the plaintiffs did not allege that they were treated differently
from similarly situated individuals). For this reason, Plaintiff's reliance on the Supreme Court's

decision in *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000) is misplaced. There, the Court explained that the complaint "can fairly be construed as alleging that the Village intentionally demanded a 33–foot easement as a condition of connecting her property to the municipal water supply where the Village required only a 15–foot easement from *other similarly situated property owners*." *Id.* at 565 (emphasis added). Here, the Complaint makes no such allegation. Accordingly, under either theory of equal protection, Plaintiff's claim fails, and Defendants' motion to dismiss Plaintiff's equal protection claim is granted.

### 3.    *Monell* Claims

Defendants argue that Plaintiff's claims against the Town, brought under *Monell*,[13] fail because nothing in the Complaint "supports a plausible inference that the Town or [Board] maintained a policy, practice, or custom" that caused Plaintiff's injuries. (Dkt. No. 8-4). Under *Monell*, liability is extended "to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation." *Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006). As Plaintiff fails to plausibly allege any underlying constitutional violations, its *Monell* claim necessarily fails as well. *E.g. id.* at 219 ("Because the district court properly found no underlying constitutional violation, its decision not to address the municipal defendants' liability under *Monell* was entirely correct."). Thus, Defendants' motion to dismiss Plaintiff's *Monell* claims is granted.

### D.    Leave to Amend

Plaintiff has requested leave to amend the Complaint in the event Defendants' motion is granted, which Defendants oppose. (Dkt. No. 15, at 27; Dkt. No. 18, at 13). In its briefing and at oral argument, Plaintiff did not identify factual allegations that would make its federal claims

---

[13] *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978).

plausible. *E.g.*, *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999) ("[W]here the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied."). Accordingly, Plaintiff's request for leave to amend the Complaint is denied.

      E.      **State Law Claims and the Article 78 Petition**

Having dismissed Plaintiff's federal claims, the Court declines, in its discretion, to retain supplemental jurisdiction over Plaintiff's state-law claims, including its Article 78 Petition. *See* 28 U.S.C. § 1367(c)(3); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine . . . will point toward declining to exercise jurisdiction over the remaining state-law claims."). As the federal claims have been dismissed prior to the investment of significant judicial resources, the "traditional 'values of judicial economy, convenience, fairness and comity'" weigh in favor of declining to exercise supplemental jurisdiction. *Kolari v. New York-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Cohill*, 484 U.S. at 350). Accordingly, Plaintiff's state law claims are remanded to New York Supreme Court, Essex County, where the case originated.

**V.    CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 8) is **GRANTED in part**; and it is further

**ORDERED** that Plaintiff's federal claims under 42 U.S.C. § 1983 (the Fourth Cause of Action) are **DISMISSED**; and it is further

**ORDERED** that the case, including Plaintiff's Article 78 Petition, is **REMANDED** to New York State Supreme Court, Essex County, under Index No. cv19-0470; and it is further

**ORDERED** that the Clerk shall mail a certified copy of this order of remand to the Clerk of the New York Supreme Court, Essex County.

**IT IS SO ORDERED.**

Dated: August 21, 2020
Syracuse, New York

Brenda K. Sannes
U.S. District Judge